***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Homick and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence. The Full Commission REVERSES the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as a matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner:
 STIPULATIONS *Page 2 
1. All parties are properly before the Commission.
2. An employee-employer relationship existed between the parties on February 23, 2007.
3. There is no question as to the misjoinder or nonjoinder of any parties.
4. Defendant-employer is self-insured and its workers' compensation claims are managed by Frank Gates Service Company, which was the Third-Party Administrator on the risk on February 23, 2007.
5. The parties stipulated to the admissibility of the following documents, which were received into evidence:
 • Exhibit 1: Pre-Trial Agreement, Industrial Commission Forms and Orders, Medical Records, Employment Records (647 pages);
 • Exhibit 2: Medical Rehabilitation Records;
 • Exhibit 3: Intracorp Vocational Rehabilitation Records;
 • Exhibit 4: Records from Carolina Case Management Rehabilitation Services, Inc.;
 • Exhibit 5: Correspondence;
 • Exhibit 6: Payroll Records; and
 • Exhibit 7: Discovery Responses.
In addition, the following exhibits were received into evidence:
 • Defendant's Exhibit 1 — Industrial Commission Form 22 Statement of Days Worked and Earnings of Injured Employee and Wage Records; and
 • Defendant's Exhibit 2 — Maintenance Planner/Scheduler Job Description.
 Issues for Determination *Page 3 
1. Whether Plaintiff's right DVT is causally related to the February 23, 2007 injury by accident?
2. Whether Plaintiff is entitled to further medical compensation under the Act for treatment of his DVT condition and treatment of his back?
3. Whether the Maintenance Planner/Scheduler position was suitable work?
4. Whether Plaintiff is entitled to further indemnity compensation?
5. Whether Plaintiff has been paid weekly benefits at the correct compensation rate, and if not, whether interest or further sanctions/penalties should be awarded?
6. Whether either side is entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1?
7. Whether Defendants are entitled to payment of one-half of the mediator's fee at this time?
 Evidentiary Rulings
When Plaintiff submitted his brief to the Deputy Commissioner, he also filed a Response to Defendants' Contentions and Motion to Strike Inadmissible Evidence relating to evidence presented regarding the offer of the Maintenance Planner/Scheduler position. Deputy Commissioner Homick denied Plaintiff's Motion to Strike, and that evidentiary ruling is affirmed.
When the case was pending before the Full Commission, Plaintiff moved to offer additional documentary evidence into the record. Defendants objected to reopening the record for receipt of additional documentation. Plaintiff's Motion with reference to this additional documentation is denied.
 *********** *Page 4 
Based upon the competent evidence adduced from the record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before Deputy Commissioner Homick, Plaintiff was 51 years old. Plaintiff is a high school graduate and has a machining technology diploma from AB Tech.
2. In May 1986 Plaintiff went to work for Rockwell International, which was subsequently purchased by Defendant-Employer. Plaintiff started as a service worker and later transferred to the tool room. Plaintiff's last position with Defendant-Employer was as a tool and die maker, a job which required crawling and kneeling as well as lifting up to 100 pounds.
3. On January 27, 2006, prior to the injury that is the subject of this claim, Plaintiff underwent a left total knee arthroplasty performed by Dr. Charles DePaolo.
4. Plaintiff's surgery was successful but his recovery was complicated by the presence of a large deep venous thrombosis (DVT) in the left leg. Plaintiff was unable to return to work until he stopped taking Coumadin, which had been prescribed for treatment of the DVT.
5. Plaintiff presented to his family physician, Dr. Kevin Burke Treakle, for treatment and monitoring of the DVT, which Dr. Treakle opined was a complication of the left total knee replacement.
6. Dr. Treakle requested a second opinion regarding the DVT from Dr. John P. Henretta, a vascular surgeon. In a June 28, 2006 letter to Dr. Treakle, Dr. Henretta explained that the primary treatment for Plaintiff's chronic DVT was anticoagulation medicine and recommended that Plaintiff remain on Coumadin for at least two years. Dr. Henretta also recommended stocking compression therapy and prescribed special stockings for Plaintiff. *Page 5 
7. On August 15, 2006, Plaintiff returned to Dr. Treakle, who advised Plaintiff that he could take aspirin instead of Coumadin and return to work on September 11, 2006.
8. In September 2006, Dr. Treakle referred Plaintiff for hypercoagulation tests, the results of which were normal in all respects and did not reflect a propensity to develop blood clots.
9. On September 6, 2006, Dr. DePaolo released Plaintiff to return to work with restrictions of sitting at least 15 minutes every hour, no bending or twisting, no kneeling or squatting, limited stairs and ladders, and no lifting over twenty (20) pounds. These restrictions were to remain in effect until October 6, 2006. There were no work restrictions assigned with regard to Plaintiff's DVT diagnosis.
10. While Plaintiff was out of work for treatment of the non-work-related left total knee replacement in 2006, he received short-and long-term disability benefits pursuant to a plan which was fully funded by Defendant-Employer. Plaintiff's LTD benefits were terminated based upon an August 25, 2006 "ArvinMeritor Return to Work Authorization" note which indicated that Plaintiff was released to return to normal work with no restrictions on August 28, 2006.
11. On February 23, 2007, Plaintiff sustained an injury to his left knee arising out of and in the course of his employment with Defendant-Employer when he slipped on some metal chips and fell while walking in the tool room
12. That same day, Plaintiff presented to Dr. Charles DePaolo, who initially diagnosed Plaintiff with a contusion of his left knee and osteoarthrosis. Plaintiff was instructed to continue wearing a left knee brace and was released to return to work with limited bending and twisting, limited kneeling and squatting, and limited stairs and ladders. Dr. DePaolo also prescribed physical therapy. *Page 6 
13. On March 20, 2007, Plaintiff returned to Dr. Treakle, who found no evidence that Plaintiff had any recurrent clots.
14. Plaintiff continued to treat with Dr. DePaolo and Dr. Treakle. During this time, Plaintiff's left knee became increasingly symptomatic.
15. Defendants accepted Plaintiff's February 23, 2007 left knee injury as compensable with the filing of a Form 60 Employer's Admission of Employee's Right to Compensation
on November 5, 2007. At that time, Plaintiff had not lost any time from work due to the February 23, 2007 work accident because Defendant-Employer had accommodated Plaintiff's work restrictions.
16. On November 19, 2007, Plaintiff presented to Dr. David DuPuy, an orthopedic specialist, for a second opinion that had been recommended by Dr. DePaolo. Dr. DuPuy recommended revision of the left knee arthroplasty.
17. On February 8, 2008, Plaintiff presented to Dr. Bryan Springer, an orthopedic surgeon who ultimately opined that Plaintiff required revision surgery. Because of Plaintiff's history of DVT, Dr. Springer recommended that Plaintiff undergo a pre-operative evaluation by a vascular surgeon for consideration of insertion of a clot filter.
18. On July 7, 2008, a Greenfield filter was inserted prior to Plaintiff undergoing the left knee revision by Dr. Springer on July 9, 2008.
19. Post-operatively Plaintiff developed a right leg femoral vein blood clot below the filter that had been placed on July 7, 2008. Coumadin therapy was resumed under the direction of Dr. Treakle. Despite ongoing Coumadin therapy, Plaintiff continues to experience pain and swelling in both of his legs with pooling of blood around his ankles, and finds it necessary to lie down throughout the day to elevate his legs. *Page 7 
20. On January 15, 2009, Dr. Springer opined that Plaintiff would have permanent limitations including an inability to crawl, bend, or do any kind of stooping or lifting from ground to waist level.
21. After the left knee revision surgery Plaintiff began work hardening at the recommendation of Dr. Springer. When Plaintiff returned to Dr. Treakle on February 16, 2009, he reported that he had experienced some nausea with the vigorous workouts and had developed low back pain and radicular pain in the left foot. Dr. Treakle recommended that Plaintiff undergo an MRI, the results of which revealed a left extrusion at L4-5.
22. On March 13, 2009, Plaintiff returned to Dr. Springer, who recommended that Plaintiff be evaluated by a physiatrist for an L5 nerve root block for his back pain.
23. On May 1, 2009, Plaintiff presented to Dr. Stephen David, an orthopedic surgeon, who recommended additional physical therapy.
24. At his June 2, 2009 visit with Dr. David, Plaintiff demonstrated that he could extend fully and flex until his fingertips touched the floor. Dr. David released Plaintiff from a spinal standpoint without any restrictions and also released Plaintiff to return to work conditioning activities for his knee.
25. According to Dr. David, Plaintiff will likely continue to have low back problems because the condition of the herniated disc "definitely has changed to becoming [sic] more abnormal." Because of the herniated disc, Plaintiff may from time to time need treatment as the symptoms occur.
26. On June 10, 2009, Plaintiff underwent a Functional Capacity Examination (FCE), which revealed that he was capable of working at the light demand level for an eight hour work day. *Page 8 
27. On July 13, 2009, Plaintiff returned to Dr. Springer, who opined that Plaintiff had reached maximum medical improvement and was unable to return to his previous job as a tool and die maker based upon the results of the FCE. Dr. Springer released Plaintiff to return to sedentary work and assigned restrictions of no repetitive lifting, pushing, or pulling greater than 25 pounds, and no standing or walking greater than thirty minutes per hour.
28. On July 27, 2009, Plaintiff took a copy of his work restrictions to Defendant-Employer and left it in the personnel office. When he didn't hear back from anyone about return to work, he went back to the plant and was told that he could no longer work there because Defendant-Employer would not accommodate long-term work restrictions.
29. Dana Sarti had been providing medical case management services to Plaintiff throughout his claim. She contacted Mr. Freeman, Defendant-Employer's personnel manager, on August 25, 2009, and based upon her conversation with Mr. Freeman indicated in her closure report that the employer was not able to accommodate restrictions and that she recommended vocational rehabilitation.
30. Defendants assigned Ms. Barbara Pollock to provide vocational case management services beginning in January 2009. As part of his vocational rehabilitation, Plaintiff took computer classes to learn Word 2007 and Excel 2007.
31. In April 2010 Defendants assigned a different vocational case manager, whose first order of business was to schedule an appointment for Plaintiff with Dr. Springer to review a job description for a Maintenance Planner/Scheduler position with Defendant-Employer which would pay Plaintiff the same wages he was earning at the time of the injury. When Plaintiff and the vocational case manager met with Dr. Springer on April 22, 2010, Dr. Springer refused to *Page 9 
approve the job description because he said that Plaintiff should be able to elevate his leg and walk and stand at his discretion and that he should not have to climb stairs.
32. In a letter dated May 24, 2010, Dr. Treakle indicated that Plaintiff is "100 percent disabled and unable to work." Dr. Treakle described Plaintiff's limitations as follows:
 He is unable to walk as a regular part of his job. He is unable to stand as a regular part of any work and he cannot climb stairs or ladders. He cannot bend, stoop or crawl. Due to his chronic problems with lower extremity edema . . . he needs to elevate his legs while he is lying on his back in a supine position three to four times during any eight hour period. He usually needs to do this for 15 to 20 minutes per time.
Dr. Treakle later opined that Plaintiff likely couldn't work more than 20 hours per week, given his problems with chronic pain and swelling in his lower extremities.
33. Defendants retained Mr. William McClure to perform an ergonomic job analysis of the Maintenance Planner/Scheduler position. Because there was no one currently doing the job, Mr. McClure had to rely on Defendant-Employer's description of what would be required of Plaintiff if he accepted the job. The job as described to Mr. McClure required an employee to check a daily planner, attend morning meetings, distribute work orders, assign tasks, access computer data, evaluate broken parts, schedule meetings and maintain an inventory list of supplies and materials. Other employees in the maintenance department would bring parts on a cart to the maintenance planner/scheduler to record numbers or obtain information. William McClure confirmed that the office Defendant-Employer had set up for Plaintiff for this position would be on the ground level and that minimal walking would be required.
34. William McClure concluded that the Maintenance Planner/Scheduler position that Defendant-Employer envisioned for Plaintiff was a sedentary position and that Plaintiff could perform the job without exceeding his work restrictions. *Page 10 
35. On April 22, 2010, Dr. Springer confirmed Plaintiff's work restrictions of sedentary work only, with walking and standing to be done at his discretion, no stair climbing, and Plaintiff should be able to elevate his legs as needed.
36. David Robinson, Plaintiff's former supervisor, testified that the position of planner/scheduler has existed in the maintenance department for a number of years, and the need for a similar position in the tool room became apparent sometime in 2009. The position has been approved since approximately February of 2009 but it has not been filled or advertised internally or externally. Prior to the new position being approved and at the time of the hearing, there were four people performing portions of this position in addition to their regular duties, resulting in substantial overtime having to be paid to these employees.
37. No one who testified at the hearing knew whether there had ever been a Maintenance Planner/Scheduler for the tool room. However, Plaintiff had never known there to be a Maintenance Planner/Scheduler in the tool room, and Mr. Robinson confirmed that there was not a Maintenance Planner/Scheduler employed by Defendant-Employer on February 23, 2007 or as of the date of the hearing before Deputy Commissioner Homick.
38. Defendant-Employer has employed Planner/Schedulers in other departments for many years. These Planner/Schedulers work on the second level of the plant, which is accessible only by stairs. Moreover, these Planner/Schedulers are required to be out in the plant inspecting machinery and coordinating repairs.
39. Mr. Robinson testified that Plaintiff would be an excellent candidate for the job because he knows the process and the products well. However, the Maintenance Planner/Scheduler job description indicates that it requires a working knowledge of hydraulics *Page 11 
and pneumatics and their interface with electrical and electronic controls, knowledge which Plaintiff testified he is lacking.
40. Plaintiff retained Mr. Charlie Edwards to provide expert vocational evidence. Mr. Edwards testified that it would be difficult for Plaintiff to transfer into the Maintenance Planner/Scheduler position without specific training, which could take a year or more. According to Mr. Edwards, Plaintiff does not retain the physical capacity to perform the Maintenance Planner/Scheduler job or to do other sedentary work as defined by the Dictionary of Occupational Titles for a full eight-hour workday, given the work restrictions assigned by Dr. Treakle and Dr. Springer. Mr. Edwards testified that there are no jobs in the competitive labor market that permit an employee to elevate his legs above heart level at his discretion. Moreover, given Plaintiff's restrictions, there are no jobs in the regional economy (western North Carolina) that Plaintiff could perform without special considerations being offered to accommodate his restrictions. While Mr. Edwards testified that it would not be futile for Plaintiff to seek employment, he did not think Plaintiff would find work, particularly work paying him wages comparable to that he was earning at the time of his injury.
41. Mr. Edwards testified that even if Plaintiff could physically perform the Maintenance Planner/Scheduler position that was made available to him at Defendant-Employer, it would not be a job that he would be able to obtain from any other Employer. Defendants did not offer any evidence to the contrary on this issue.
42. Based upon the preponderance of the evidence in view of the entire record, Plaintiff's L4-5 herniated disc was caused by his participation in work hardening, which in turn was necessitated by the February 23, 2007 left knee injury. *Page 12 
43. Based upon the preponderance of the evidence in view of the entire record, Plaintiff's development of right lower extremity DVT and aggravation of his left lower extremity DVT was a direct and natural consequence of the injury he sustained to his left knee on February 23, 2007.
44. Plaintiff's ongoing Coumadin therapy and treatment for DVT, including compression stockings, is reasonable and necessary to effect a cure, give relief, and lessen the period of disability related to his February 23, 2007 injury.
45. Based upon the preponderance of the evidence in view of the entire record, the Maintenance Planner/Scheduler job was not suitable to Plaintiff's capacity, nor did it reflect Plaintiff's capacity to earn wages in the general economy.
46. Based upon the preponderance of the evidence in view of the entire record, Plaintiff is physically unable, as a result of the injury he sustained on February 23, 2007 and the conditions he later developed as a result of that injury, to earn any wages in any employment as a result of the February 23, 2007 injury.
47. During the period of Plaintiff's disability he has received long-term disability benefits pursuant to a plan which was fully funded by Defendant-Employer.
48. Defendants initially paid Plaintiff per week, based upon an average weekly wage of $868.62. Defendants subsequently re-calculated the average weekly wage and began paying Plaintiff $614.55 per week based upon an average weekly wage of $921.80. When Defendants corrected the compensation rate, they also paid Plaintiff a ten percent penalty for late payment.
49. Plaintiff lost more than seven consecutive calendar days from work during the 52 weeks prior to February 23, 2007. Specifically, Plaintiff was out of work receiving short-and long-term disability because of his non-work-related left knee surgery, from January 26, 2006 to *Page 13 
September 11, 2006. After Plaintiff returned to work in September 2006, he earned $22,948.34, according to the wage records provided for that period. Dividing $22,948.34 by 23 (the number of weeks remaining after the time so lost has been deducted) produces an average weekly wage of $997.75, which in turn generates a compensation rate of $665.20.
50. Neither party has pursued this matter unreasonably or based upon unfounded litigiousness.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On February 23, 2007, Plaintiff sustained an admittedly compensable injury by accident to his left knee, arising out of and in the course of his employment with Defendant-Employer. N.C. Gen. Stat. § 97-2(6).
2. "When the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury likewise arises out of the employment, unless it is the result of an independent intervening cause attributable to claimant's own intentional conduct." Starr v. Charlotte PaperCo., 8 N.C. App. 604, ___, 175 S.E.2d 342, ____ (1970). Moreover, it is well-settled that when a pre-existing, non-disabling, non-job-related condition is aggravated or accelerated by *Page 14 
the compensable injury, the resulting disability is compensable.Morrison v. Burlington Indus.,304 N.C. 1, 18, 282 S.E.2d 458, 470 (1981). As a direct and natural result of his February 23, 2007 injury by accident, Plaintiff suffered a right lower extremity DVT and an aggravation of his preexisting left lower extremity DVT, as well as a herniated disc at L4-5 suffered while he was participating in work hardening for treatment of the compensable injury. Defendants shall therefore be responsible for all disability and medical treatment related to these conditions, as well as that related to treatment of his left knee, so long as such treatment is reasonable and necessary to effect a cure, give relief, or lessen the period of Plaintiff's disability. N.C. Gen. Stat. § 97-25.
3. As a result of the February 23, 2007 injury, Plaintiff has been unable to earn any wages in any employment since the date he last worked prior to the left knee revision surgery in 2007. N.C. Gen. Stat. § 97-2(9); Russell v. Lowes Prod. Distrib.,108 N.C. App. 762, 425 S.E.2d 454 (1993). Plaintiff is therefore entitled to ongoing temporary total disability benefits pursuant to N.C. Gen. Stat. § 97-29.
4. Assuming, arguendo, that Plaintiff was physically capable of performing the Maintenance Planner/Scheduler position, it nevertheless is not evidence of earning capacity because there is no evidence that other employers would hire Plaintiff, with his limitations, at a comparable wage level. ". . . [T]he fact that an employee is capable of performing employment tendered by the employer is not, as a matter of law, an indication of plaintiff's ability to earn wages." Peoples v. Cone Mills Corp.,316 N.C. 426, 434, 342 S.E.2d 798, 804 (1986).
5. Plaintiff was employed by Defendant-Employer during the 52 weeks prior to the date of injury. However, he missed more than seven consecutive days during that period due to his absence from work for the non-work-related left total knee replacement. Even though he received short-and long-term disability benefits during the time he was out of work, those amounts were not "earnings" within the meaning of N.C. Gen. Stat. § 97-2(5). Therefore, Plaintiff's average weekly wage should be calculated using the second method set forth in the statute, i.e., ". . . the earnings for the remainder of such 52 weeks shall be divided by the number *Page 15 
of weeks remaining after the time so lost has been deducted." These calculations generate an average weekly wage of $997.75 and a compensation rate of $665.20.
6. Pursuant to N.C. Gen. Stat. § 97-18(g), Defendants shall pay Plaintiff a ten percent penalty on the amount of the accrued underpayment based on the incorrect calculation of the average weekly wage. There is no statutory basis for payment of interest on this amount, and therefore Plaintiff's claim in that regard is denied.
7. In the discretion of the Industrial Commission, Defendants shall be entitled to a credit for the long term disability benefits that were paid to Plaintiff during the period of disability awarded herein. N.C. Gen. Stat. § 97-42.
8. According to the Rules for Mediated Settlement Conferences, the mediator's fee "shall be allocated to the parties, as follows: one share by plaintiff(s); one share by the workers' compensation defendant-employer or its insurer." N.C. Mediated Settlement Neutral Evaluation Conferences, North Carolina Industrial Commission Rule 7(c). The Rule further states that defendant is responsible for paying plaintiff's share of the mediator costs, but when the case is concluded, defendant shall be reimbursed for plaintiff's share from benefits that may be determined to be due to plaintiff, and defendant may withhold funds from any award for this purpose. Therefore, Defendants are entitled to withhold one-half of what they have paid in mediator's fees to date from the compensation awarded to Plaintiff.
9. Neither party has defended or pursued this action in an unreasonable manner or without reasonable grounds and is therefore not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1. Sparks v. Mountain BreezeRestaurant, 55 N.C. App. 663, 286 S.E.2d 575 (1982).
 *********** *Page 16 
Based upon the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay temporary total disability compensation to Plaintiff at the rate of $665.20 from the date of last payment and continuing until Plaintiff returns to work or further order of the Commission, subject to a credit for the long term disability benefits Plaintiff has received pursuant to the plan that was fully funded by Defendant-Employer, as well as a credit for one-half of the mediator's fees that Defendants have paid thus far in the case. For those periods of time during which Plaintiff was paid temporary total disability benefits at the incorrect compensation rate, and in addition pay a ten percent (10%) penalty pursuant to N.C. Gen. Stat. § 97-18(g) on the accrued underpayment.
2. Defendants shall pay pursuant to the Fee Schedule all medical expenses incurred by Plaintiff for treatment of his knee and back injuries and his bilateral DVT condition.
3. A reasonable attorney's fee in the amount of twenty-five percent (25%) of Plaintiff's ongoing benefits and twenty-five percent (25%) of the lump sum of accrued compensation due Plaintiff is approved for plaintiff's counsel and shall be paid directly to Plaintiff's counsel. The twenty-five percent shall be calculated on the amount due Plaintiff after Defendants take their credit for the long term disability benefits and Plaintiff's share of the mediator's fees.
4. Defendants shall pay the costs.
This the ___ day of October 2011.
 S/_____________ TAMMY R. NANCE COMMISSIONER *Page 17 
CONCURRING:
 S/_______________ DANNY L. McDONALD COMMISSIONER
 S/_______________ PAMELA T. YOUNG CHAIR *Page 1